# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JESSE HARALSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 12 C 7084 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Jesse Haralson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A). Mr. Haralson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Haralson applied for SSI on June 9, 2010, alleging that he had become disabled on January 1, 2009, due to seizures and high blood pressure. (Administrative Record ("R.") 129-32, 144, 186-90). His claim was denied initially and upon reconsideration. (R. 68-73, 77-79). Mr. Haralson continued pursuit of his claim by filing a timely request for hearing. (R. 126-284).

On May 11, 2010, just two weeks before his hearing, Mr. Haralson changed his alleged onset date to September 9, 2010. (R. 212). An administrative law judge ("ALJ")

convened a hearing on May 25, 2011, at which Mr. Haralson, represented by counsel, appeared and testified. (R. 39-67). In addition, George Paprocki testified as a vocational expert. (R. 39). On June 17, 2011, the ALJ issued a decision finding that Mr. Haralson was not disabled because he retained the capacity to perform any job as long as it did not involve climbing ropes, ladders, scaffolds, unprotected heights, or dangerous machinery; any more that occasional climbing of ramps or stairs, balancing, stooping, kneeling crouching, or crawling; or any more than frequent use of both hands for fingering and handling objects. (R. 21-37). This became the final decision of the Commissioner when the Appeals Council denied Mr. Haralson's request for review of the decision on July 17, 2012. (R. 1-5). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Haralson has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Haralson was born on August 10, 1957, making him fifty-three years old at the time of the ALJ's decision. (R. 192). He has a high school education, and went to trade school to learn roofing work. (R. 43, 145-46). From 1976 until 2003, he worked in construction, mostly as a roofer. (R. 146).

### B.

### The Medical Evidence

The medical evidence in this case is rather scant. Mr. Haralson has been treated for a few medical conditions over the years. He claims he started having seizures when he was in 12th grade, but was told that he would grow out of them. (R. 45). He went to the emergency room complaining of seizures in March of 2009, but left without waiting for treatment. (R. 289-91). He reported that he experienced a seizure in January of 2010, when he wasn't taking his Dilantin. (R. 250, 254). In March 2010, he reported his seizures were controlled with Dilantin. (R. 252). In July of 2010, his treating physician indicated that his seizures were due to noncompliance with medication and he was encouraged to take his Dilantin. (R. 273). When he took his medication, his seizures were well controlled. (R. 275).

Mr. Haralson has also been treated for hypertension. His blood pressure readings have been varied, but spikes are often due to his noncompliance with medication and/or dietary restrictions: March 25, 2009 – 174/124; January 19, 2010 – 150/90 (R. 254); February 25, 2010 – stable and asymptomatic (R. 253); March 25, 2010 – stable and asymptomatic (R. 252); April 8, 2010 – 150/90, medication changed (R. 251); July 1, 2010 – elevated due to noncompliance (R. 278); July 15, 2010 – elevated (R. 275); July 29, 2010 – elevated not at goal (R. 274); September 7, 2010 – 137/88 (R. 426); February 10, 2011 – elevated due to noncompliance with diet (R. 320); March 5, 2011 – 140/90, had been well controlled on medications (R. 317).

On September 7, 2010, Mr. Haralson sought treatment for swelling in his left hand. He had good circulation and radial pulse. (R. 364). X-ray revealed soft tissue swelling and some degenerative changes to his left wrist. (R. 368). On September 25,

2010, it was reported that his "gout" was stable with medication. (R. 314). Curiously, the reference was to swelling, not in his left, but his right hand. (R. 313).

Mr. Haralson began complaining of sleep apnea in April of 2011. (R. 327-30). As he had hypertension, physicians felt it was "more likely that he ha[d] OSA [obstructive sleep apnea]. (R. 341). He suffered from daytime drowsiness, loud snoring, and awakenings to gasping/choking associated with chest pain. (R. 342). Both his girlfriend has the emergency room nurse observed him stopped breathing while he was asleep. (R. 339).

On July 2, 2010, Dr. Panepito reviewed the medical evidence on behalf of the state disability agency. He determined that Mr. Haralson had a history of seizures and high blood pressure. (R. 260-61, 263). He had no exertional limitations, but was limited in his ability to climb ramps and stairs, could never climb ladders, ropes, or scaffolds, and could not work around hazards. (R. 261, 263). Dr.Panepito found his allegations "partially credible." (R. 266). On September 28, 2010, state agency physician Dr. Jimenez reviewed the evidence and concurred with Dr. Panepito. (R. 293-95).

In October 2011, Mr. Haralson was referred to the sleep disorders clinic. He complained of severe snoring, insomnia, and sleep apnea. (R. 434). Symptoms of the sleep apnea included interrupted breathing, fatigue, and excessive daytime drowsiness. (R. 434, 444). He used a CPAP machine previously – in June 2011 – and liked it. (R. 434). A sleep study recorded a normal sleep efficiency of 90.8%, but the number of arrousals from sleep was significantly elevated. Sleep quality was improved during the treatment segment with increased airway pressure. Oxygen saturation was below 90% nearly all the time with a nadir of 67%. (R. 444-48). The diagnosis was severe

obstructive sleep apnea, treatable with CPAP.  Use of a CPAP was recommended.  (R. 449). It was also recommended that Mr. Haralson lose weight and increase exercise.  (R. 436).

More recently, Mr. Haralson was diagnosed with type 2 diabetes and started taking metformin. (R. 395, 402-403).  He was also given anti-depressant medication – fluoxetine and trazadone.  (R. 395, 403).  He was said to have probable depression due to his unemployment and medical problems, but was progressing as expected.  (R. 404).

## C.

### The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At his hearing, Mr. Haralson explained that he quit working because he was too scared he'd have a seizure.  (R. 45). He said the seizures got worse as he got older.  (R. 46).  It would take him 4-5 days to recover because his legs became stiff and he could hardly walk.  (R. 48).  He claimed to have had a seizure three days before the hearing.  (R. 48).  Mr. Haralson stated that, despite what his medical records might say, he was taking his medication.  (R. 47).  They were trying to get him a CPAP machine but he had no insurance.  (R. 47).

Mr. Haralson – who is right-handed – testified that he had gout in his left hand and his foot.  (R. 49-50, 58).  Flare-ups occurred twice a month and caused swelling and pain.  (R. 49-50).  He said his sleep disorder was causing him anxiety.  (R. 52).  If he could "get himself together with the insurance", he would see a psychologist about it.  (R. 52).

Mr. Haralson said he could walk no more than a half block when he had a gout flare-up or after a seizure. (R. 55). He had no problem sitting, but could stand no more than three minutes. (R. 56). The most comfortable position for him was lying down. (R. 56-57). His girlfriend did his cleaning, cooking, and shopping. (R. 59). He spent most of the day sitting in the house or on the porch. (R. 50). If he felt good, he might walk to the park or the store. (R. 61).

### 2.

### The Vocational Expert's Testimony

Mr. Paprocki then testified as a vocational expert ("VE"). The ALJ first asked the VE whether a person with plaintiff's age, education and work experience had no exertional limitations and could not climb ladders, ropes and scaffolds; had the ability to occasionally climb ramps and stairs and to occasionally balance, stoop, kneel, crouch and crawl; and should avoid unprotected heights and dangerous moving machinery would be able to perform Mr. Haralson's past job as a roofer or construction carpenter assuming a person. The VE said that such an individual could not perform such work. (R. 62). But he also said that an individual with the foregoing limitations would be able to perform other work, specifically, laundry worker one or two. In those positions, the person would feed off-bearing laundry equipment. Approximately 5,000 such jobs existed in Illinois and 110,000 on a national basis. The VE also said that a person with those same limitations would be able to perform a basic light work cleaning position in housekeeping or cleaning hotel and motel rooms or offices. There were 25,000 such jobs in Illinois and about 430,000 jobs nationally. (R, 63).

Mr. Haralson's counsel then posed an increasingly restrictive series of hypothetical questions, piling additional limitations onto the original hypothetical question. In one hypothetical, Mr. Haralson's attorney asked whether an individual who had three seizures a

month and would be absent or would have to take extended breaks could perform any work. The VE explained that such limitations would eliminate competitive jobs and, in fact, even missing more than one day a month would eliminate competitive jobs. (R. 64). The VE also testified that if the individual would miss more than 30 minutes in addition to regular breaks, not surprisingly, competitive employment would be precluded. (R. 64). In response to another hypothetical based on the ability to occasionally perform manipulative hand movements, the VE stated that such a person would be unemployable if it would cause him to miss more than ½ hour on an ongoing basis. (R. 65). In response to yet another hypothetical question, the VE said that a person limited by a combination of gout, seizures, sleep apnea and daytime drowsiness which would reduce work productivity by 15% would not be able to perform any jobs. (R. 65). Finally, according to the VE, if a person was limited to frequent but not repetitive handling and fingering, it would not affect the person's ability to perform the laundry worker or cleaning positions because they did not require continuous manipulative ability. But, if that person could only perform occasional handling and fingering, the above-listed jobs would be precluded. (R. 65-66).

## D.

### The ALJ's Decision

The ALJ found that Mr. Haralson suffered from the following severe impairments: seizure disorder, gout, hypertension, diabetes mellitus, sleep apnea, and obesity. (R. 26). She further found that Mr. Haralson did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 28). Next, the ALJ summarized the evidence in the medical record and discussed Mr. Haralson's

testimony, and determined that he could perform work at any level of exertion as long as it did not involve climbing ropes, ladders, scaffolds, unprotected heights, or dangerous machinery; any more that occasional climbing of ramps or stairs, balancing, stooping, kneeling crouching, or crawling; or any more than frequent use of both hands for fingering and handling objects. (R. 28).

The ALJ found Mr. Haralson less than fully credible. She felt that the medical evidence did not support the extent of his allegations. (R. 31). She noted that he was repeatedly non-compliant with his treatment regimen. (R. 31). The ALJ gave significant weight to the opinions of state agency physicians Drs. Panepito and Jimenez, who reviewed the record and found Mr. Haralson capable of (R. 31).

The ALJ went on to consider the VE's testimony. Crediting it, she found that, given his residual functional capacity ("RFC"), Mr. Haralson could perform jobs that exist in significant numbers in the economy. These jobs included laundry worker I and II , and cleaner/housekeeper. (R. 32). Accordingly, the ALJ found Mr. Haralson not disabled and not entitled to SSI under the Act. (R. 32).

## IV.

### DISCUSSION

#### A.

**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008),

*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

## B.

## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Mr. Haralson submits that there are several flaws in the ALJ's decision. First, he argues that the ALJ could not have found he had severe impairments while at the same

time concluding he had no exertional limitations. Second, he submits the ALJ erred by giving great weight to the state agency physicians. Third, Mr. Haralson complains that the ALJ employed boilerplate in her credibility finding and failed to consider the fact that he had no health insurance. Fourth, Mr. Haralson argues that the ALJ failed to full and fairly develop the record. Finally, he asks that this case be remanded for consideration of new and material evidence.

**1.**

In making her residual functional capacity determination, the ALJ found that Mr. Haralson, despite suffering from several severe impairments, had absolutely no exertional limitations. That gives Mr. Haralson a capacity for very heavy work. In other words, on a daily basis, the fifty-three-year-old Mr. Haralson, suffering from several severe impairments, including diabetes, hypertension, obesity, and gouty arthritis, is expected to lift objects weighing more than one hundred pounds and frequently carry objects weighing fifty pounds or more on a daily basis. 20 CFR §416.967(e). It does, as Mr. Haralson suggests, seem counterintuitive.

Especially when one considers the fact that the ALJ determined that one of the severe impairments Mr. Haralson had was gout and it affected his right hand – his dominant hand. (R. 31). Consequently, the ALJ found that Mr. Haralson was limited in *both* hands to fingering and handling objects – of any size or weight – no more than two-thirds of the day. (R. 28); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008)(frequently means between one-third to two-thirds of the workday). It strains logic that this same man could carry objects weighing fifty to one hundred pounds for two-thirds of every workday. 20 CFR §416.967(e). A severe impairment that robs both

hands of the ability to handle even very light objects would seem to rob those hands of the ability to handle and grasp extremely heavy objects on a regular basis ever day at work.

The ALJ appears to have given Mr. Haralson the benefit of the doubt on his gouty arthritis. The evidence in the medical record is indeed scant – a single flareup over the course of years. It was rather quickly stabilized with medication and, also, was likely limited to his left hand as that was the hand that was x-rayed. (R. 313-14, 364, 368). But the ALJ determined the gout was a severe impairment affecting both hands, and it is from there that the court must trace the path of her reasoning. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Without any explanation regarding how the gout that limited Mr. Haralson's ability to grasp objects would allow him to carry objects weighing over fifty pounds for two thirds of every workday, the ALJ's decision fails to build a logical bridge from the evidence to her conclusion, and this case must be remanded. *Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012).

**2.**

Mr. Haralson also finds fault with the ALJ's credibility finding, complaining that the ALJ employed the following "boilerplate" language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 29). The Seventh Circuit has, indeed, criticized this language as meaningless *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010). But, sadly, those cases have done little more than launch a thousand

macros. Invariably, attorneys for disability claimants have failed to notice that the Seventh Circuit has also explained that the offensive boilerplate is not toxic. It can be overlooked if the ALJ provides reasons for his credibility determination. *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013); *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir.2012); *Shideler v. Astrue,* 688 F.3d 306, 312 (7th Cir. 2012). And so, in cases like this, where the ALJ has supplied reasons for her credibility determination – a fact Mr. Haralson concedes in his brief (*Plaintiff's Memorandum*, at 9) – the boilerplate argument is as meaningless a piece of boilerplate as the boilerplate it targets.

Beyond that, Mr. Haralson has a problem with the ALJ's reasoning. First, he complains that the ALJ failed to identify precisely which of his statements she found credible and which she didn't. (*Plaintiff's Memorandum*, at 9). But, there is no requirement that the ALJ do so. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir.2003). That's especially the case here, where the overall medical record, as the ALJ found, simply does not support the severity of Mr. Haralson's allegations. *See Jens*, 347 F.3d at 209 (refusing to reverse ALJ's decision where ALJ did not specify which statements were not credible when the record supported the ALJ's findings). As in *Jens*, Mr. Haralson's complaints here were out of proportion with the medical evidence. Such discrepancies are indicative of exaggeration of symptoms. *Pepper v. Colvin*, 712 F.3d 351, 368-69 (7th Cir. 2013); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005). The gist of the medical record is that, when Mr. Haralson followed doctor's orders, his impairments were controlled. When he didn't, he suffered the consequences.

But this leads to another problem with the ALJ's decision. As Mr. Haralson argues, the ALJ indicated that he testified that he didn't take his medication because he couldn't afford to pay for it. The ALJ put it this way: "At the hearing, the claimant explained that his non-compliance was a result of financial issues." (R. 31). Contrary to both the ALJ and Mr. Haralson[1], that's not exactly what he said. When the ALJ asked why Mr. Haralson had not been compliant with his medication regimen, his testimony was equivocal:

> A. Well, every time I was going and then when I tell her that I'm having, you know, having a seizure, they say, are you taking your medicine? And I say, yes, I'm taking my medicine. But, you know, there's so many people in the clinic they did this rush you in, rush you out, they're not going to give you no paperwork or nothing because you don't have no insurance. I don't have any insurance, so all they're going to do is rush me in, rush me out.
>
> Q. So are you taking your medications?
>
> A. Yeah, I'm taking my medications.
>
> Q. Do you have difficulty getting your medications sometimes?
>
> A. Well, right now they finally give me something to get them with but I can't get certain things.

(R. 47). It turns out the certain thing he can't get is a CPAP machine, which would be no excuse for not taking his seizure or blood pressure medication. So, there are some credibility problems with Mr. Haralson attributing his non-compliance with treatment – including his dietary restrictions – to his finances.

---

[1] But not contrary to the Commissioner. Recognizing the ALJ's finding was a misstep, the Commissioner argues that Mr. Haralson never testified he couldn't afford medication. (*Defendant's Memorandum*, at 5). That argument is a violation of the *Chenery* doctrine. The court is limited to reviewing the ALJ's reasoning, not some augmented opinion supplied by the Commissioner's able lawyers. *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

But the ALJ soldiered past all that and accepted the fact that finances were to blame. Then she simply brushed it aside:

> While that explanation is understandable, it does not change the fact that the medical record indicates the claimant's seizure disorder is well-controlled with medication. The medical record also suggests claimant's sleep apnea would be controlled with a C-PAP machine.

(R. 31). And if Richard III had only had that horse. Having found Mr. Haralson's financial state to be the reason for his failure to follow treatment, the ALJ could not then rest her credibility determination on that failure without further investigation. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)(". . . the ALJ should not have rested his credibility determination on [plaintiff's] failure to seek treatment after" plaintiff lost his insurance); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)(inability to afford it is a "good reason" for not seeking treatment). The record here certainly demonstrates that Mr. Haralson often did have access to medication and took it. The question is, what was different, financially speaking, about those times? But the ALJ didn't explore that path and her credibility finding is lacking a logical bridge.

### 3.

Mr. Haralson claims that the ALJ didn't fully develop the record because she question him on his ability to sit, stand, or lift. (*Plaintiff's Memorandum*, at 10). That's simply not true. She questioned him on each of these points. (R. 56-57). He also contends that the ALJ had to accept the limitations his attorney proposed in his hypothetical to the VE at the hearing. Almost invariably, plaintiffs' attorneys will propound a series of drastically severe limitations – "dead claimant RFCs" in the vernacular, *West v. Colvin*, 2013 WL 3728807, *15 (N.D.Ill. 2013) – which generate the desired response from a VE. But the ALJ is required to include only those limitations

15

that find credible support in the record in her hypothetical to the VE. *Seamon v. Astrue*, 364 Fed.Appx. 243, 248 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir.2007).

The ALJ didn't believe that Mr. Haralson had to take several half-hour breaks during the day or that, even then, he would only be productive for 85% of the remaining time he worked, so she appropriately rejected the RFC finding from Mr. Haralson's counsel. Her credibility finding may have been flawed from a logical bridge standpoint, but that doesn't mean her conclusion was wrong. The Seventh Circuit does not allow a district court to affirm an ALJ's opinion – even if it is supported by substantial evidence – if the reasoning is somehow flawed or cannot be followed. *See Sarchet*, 78 F.3d at 307 (Posner, J.)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *but see In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004, 1008 (7th Cir. 2012)(Posner, J.)(affirming district court ruling although it "was abrupt and not explained"); *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010)("We may affirm the district court's grant of summary judgment for any reason supported by the record."); *Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 974 (7th Cir. 2001)("We are not bound by the rationale underlying the district court's determination. Rather, we may affirm the district court's judgment "on any ground that is supported in the record.").

Beyond that, Mr. Haralson suggests that the fact that he does not have health insurance hamstrung his case and made it incumbent on the ALJ to supplement the

16

medical evidence. He claims that, due to the economy, his predicament is becoming increasingly common and claimants like him are unable to accumulate a medical record. (*Plaintiff's Reply*, at 1-2). But Mr. Haralson's situation is nothing new. He's no different than any applicant for SSI has been in since the program was instituted. The benefits are designed for those with limited income and resources, 42 U.S.C. §1381a, and these people usually do not have health insurance.

What they do have is access to free treatment and various other government programs. Mr. Haralson is no exception. He may not be able to afford a CPAP machine, but his lack of insurance does not prevent him from seeing physicians and accumulating medical evidence to support his claim. He has a number of records from Stroger County Hospital and Provident Hospital, where treatment is available for those who cannot afford to pay for it. http://www.cookcountyhhs.org/patient-services/billing-financial-assistance/. He is clearly familiar with the system. Indeed, in the span of about two years, he has generated over 200 pages of medical evidence. While the average American makes fewer than four visits to the doctor per year, http://www.nytimes.com/2012/10/02/health/doctor-visits-dropcensus-finds.html?_r=0, Mr. Haralson made at least eight in 2010 alone. This is not a portrait of a claimant who was hamstrung by his lack of insurance.

**4.**

Mr. Haralson also asks for remand under sentence six for the ALJ to consider the results of his October 2011 sleep study. A district court may order that additional evidence be taken before the Commissioner upon a showing that there is "new evidence which is material and that there is good cause for the failure to incorporate such evidence

into the record in a prior proceeding." 42 U.S.C. § 405(g). "New" evidence is that which is "not in existence or available to the claimant at the time of the administrative proceeding." *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009). Further, "[n]ew evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir.2005).

The evidence in question is material. Much of any disability benefits decision turns on the credibility of the claimant as judged against the objective medical evidence. This case is no exception. The sleep study supports the allegations of Mr. Haralson and his girlfriend regarding his sleep habits, thereby bolstering his credibility. The evidence in question is also new, as it was not in existence at the time of the ALJ's decision. Moreover, there is good cause for Mr. Haralson having not submitted it earlier. That is simply how long it took for the clinic to follow through on the February 2011 referral. (R. 319, 330, 339, 402). Accordingly, this evidence should be considered on remand.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #11] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/20/14